Barry E. Mallen, Esq. [SBN 120005]
bmallen@laklawyers.com
**LEVINSON ARSHONSKY & KURTZ, LLP**
15303 Ventura Blvd., Suite 1650
Sherman Oaks, CA 91403
Telephone:  (818) 382-3434
Facsimile: (818) 382-3433

Attorneys for Plaintiff
KISS CATALOG, LTD.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KISS CATALOG, LTD., <br><br> Plaintiff, <br><br> vs. <br><br> JB IMPORTS, LLC and DOES 1 through 20, inclusive, <br><br> Defendants. | CASE NO. <br><br> Complaint for: <br><br> 1. False Designation of Origin/Unfair Competition in Violation of 15 U.S.C. §1125 <br> 2. Trademark Dilution in Violation of 15 U.S.C. §1125(c) <br> 3. Common Law Trademark Infringement and Unfair Competition <br> 4. Unfair Competition (Calif. B&P Code §17200) <br> 5. Breach of Contract <br><br> DEMAND FOR JURY |

## I.    Introduction

1.     Plaintiff Kiss Catalog, Ltd. is the owner of the trademarks and other intellectual property of the iconic recording group KISS. Plaintiff brings this action for False Designation of Origin and for Federal Unfair Competition and other claims against Defendant JB Imports, LLC as a result of Defendant's continued willful and unauthorized uses of the KISS trademarks after a license agreement between the parties expired pursuant to its terms on December 31, 2019.

///
///

COMPLAINT

3163-004/1173293.docx

## II.   Parties

2.      Plaintiff Kiss Catalog, Ltd. ("Plaintiff") is a New Jersey corporation with its principal places of business in Pine Brook, New Jersey and Los Angeles, California. Plaintiff is the owner of the trademarks and other intellectual property of the recording group KISS.

3.      Defendant JB Imports, LLC ("Defendant")  is, on information and belief, a Georgia corporation with its principal place of business in Marietta, Georgia. Defendant is engaged in the business of designing, manufacturing, marketing and selling alcoholic beverage products.

4.  The identity of DOES 1 through 20 is presently unknown to Plaintiff. On information and belief, DOES 1 through 20 were involved in and/or participated in and/or profited from the infringing activity set forth herein.

## III.   Jurisdiction and Venue

5.      This Court has subject matter jurisdiction pursuant to Section 39 of the Lanham Act, 15 U.S.C. §1121, and under U.S.C.  §§1331 and 1338, as well as diversity jurisdiction pursuant to 28 U.S.C. §1332.  Subject matter jurisdiction over related state and common law claims is proper pursuant to 20 U.S.C. §§1338 and 1367.

6      Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) as the contract was entered into and called for performance within this District. In addition, pursuant to Section 15.11 of the Agreement, the agreement is to be governed by the laws of the State of California, and any action "arising out of or related to [the] agreement or the services provided {t]hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of California in each case located in the city of Los Angeles and County of Los Angeles, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding and irrevocably waives the right to object to the venue and location of such courts."

LEVINSON ARSHONSKY & KURTZ, LLP

COMPLAINT

3163-004/1173293.docx

IV.   **The KISS Trademarks**

7.      KISS is one of the bestselling and most merchandised rock bands of all times.  KISS sells both sound recordings, videos and merchandise bearing its trademarks to the public as well as using the KISS trademarks to promote their concert appearances.  KISS has released over 50 audio and visual products bearing its name and trademarks, and hundreds of licensed products.  Plaintiff uses the KISS trademarks on all of its products.

8.      Having distinctive readily identifiable trademarks is an important factor in creating a market for KISS products, in identifying KISS and its brand, and in distinguishing KISS products from those of others.

9.      As a result of continuous promotion over several decades, substantial sales, and consumer recognition, Plaintiff has developed powerful trademark rights. Plaintiff maintains strict quality control standards for the products bearing its trademarks.  Genuine KISS products bearing the KISS mark are inspected and approved by Plaintiff and its licensing agent prior to distribution and sale.  Plaintiff also maintains strict control over the use of the trademarks in connection with its products in order to maintain control over its related business reputation and goodwill.

10.     Plaintiff carefully controls where, when and how products bearing its trademarks are released, marketed and sold.

11.     Plaintiff maintains strict quality control standards for products bearing its trademarks and polices unauthorized uses of its intellectual property.

12.     As it relates to wine, Plaintiff has a pending trademark application for which it has filed a Statement of Use, which was accepted by the USPTO on June 8, 2021, which lists a statement of first use of November 12, 1997, and which bears a US serial number of 86984604.  Plaintiff will amend this complaint once the registration has been issued.

///

///

COMPLAINT

3163-004/1173293.docx

## V.   Facts Common to All Claims for Relief

13.    On September 16, 2016, Plaintiff and Defendant entered into a License Agreement ( "Agreement") in which certain intellectual property, defined in the Agreement as the "Licensed IP," were licensed by Plaintiff to Defendant for the purposes of Defendant producing, manufacturing, marketing, distributing and selling KISS branded wine, defined in the Agreement as the "Licensed Product." A true and correct copy of the Agreement is attached as Exhibit 1.  Pursuant to the Agreement, the term of the Agreement expired on December 31, 2019, and there was never any extension of the term. Pursuant to the Agreement, after the Agreement expired on December 31, 2019, Defendant had what the Agreement referred to as a "Sell-Off Period" for then existing inventory which expired on June 20, 2020.

14.    Pursuant to Section 11.01 of the Agreement, upon expiration of the Agreement: (a) all rights and licenses granted pursuant to the Agreement cease; (b) Defendant shall cease all use of the Licensed Products; (c) Defendant is to cooperate with Plaintiff in the cancellation of any licenses recorded pursuant to the Agreement; and (d) Defendant shall return or, at Plaintiff's option, destroy all Licensed Product.

15.    Defendant has continued, without any authority, to manufacture, market and sell "Licensed Product" after the expiration of the "Sell-Off Period" on June 20, 2020.

16.    Section 15.09 of the Agreement provides that it may only be amended, modified or supplemented by an agreement in writing signed by each party.

17.    On February 18, 2021, Plaintiff, through its licensing agent, EpicRights ("Epic"), sent a cease and desist letter to Defendant, a true and correct copy of which is attached as Exhibit 2.  This was followed up by a letter from Plaintiff's counsel on May 26, 2021 demanding that Defendant comply with the cease and desist letter sent by Epic on February 18, 2021.  Defendant has failed to cease its unauthorized and infringing activities.  Indeed, and without limitation, Defendant, in May 2021,  from its headquarters in Georgia, caused KISS branded wine, bearing the " Licensed IP," to

4

LEVINSON ARSHONSKY & KURTZ, LLP

1   be distributed and sold in Mexico long after the Sell-Off Period had expired and after
2   receipt of the cease and desist letter sent on February 18, 2021 by Plaintiff's licensing
3   agent, Epic.

4   **VI.   Claims for Relief**

5   **First Claim for Relief for False Designation of Origin/Unfair**
6   **Competition in Violation of 15 U.S.C. §1125**

7   18.   Plaintiff repeats and realleges paragraphs 1 through 17.

8   19.   Defendant has continued to exploit the "Licensed IP" without
9   authorization after its rights to do so expired upon the expiration of the "Sell-Off
10   Period" on June 20, 2020. Such unauthorized and willful uses by Defendant of the
11   "Licensed IP" after Defendants' rights expired constitutes a false association and false
12   designation of origin, trades on the fame of the KISS trademarks and brand, and
13   falsely leads consumers to believe that this is an official licensed product of Plaintiff
14   when it is not.  Such use constitutes a false designation of origin and unfair
15   competition in violation of 15 U.S.C. §1125.

16   20.   As a result of the foregoing willful infringement, Plaintiff is entitled to
17   injunctive relief, compensatory damages according to proof, treble damages,
18   attorneys' fees, an accounting, and the disgorgement of all revenue collected by
19   Defendant since the expiration of the "Sell-Off Period."

20   **Second Claim for Trademark Dilution Pursuant to 15 U.S.C. §1125(c)**

21   21.   Plaintiff repeats and realleges paragraphs 1 through 17.

22   22.   Defendant has continued to exploit the "Licensed IP" without
23   authorization after its rights to do so expired upon the expiration of the "Sell-Off
24   Period" on June 20, 2020. Such  unauthorized uses by Defendant of the "Licensed IP"
25   dilutes the strength of Plaintiff's mark and constitutes trademark dilution pursuant to
26   15 U.S.C. §1125(c).

27   23.   As a result of the foregoing willful infringement, Plaintiff is entitled to
28   injunctive relief, compensatory damages according to proof, attorneys' fees, an

LEVINSON ARSHONSKY & KURTZ, LLP

5

COMPLAINT

1   accounting, and the disgorgement of all revenue collected by Defendant since the

2   expiration of the "Sell-Off Period."

### Third Claim for Relief for Common Law Trademark Infringement

4      24.      Plaintiff repeats and realleges paragraphs 1 through 17.

5      25.      Defendant has continued to exploit the "Licensed IP" without

6   authorization after its rights to do so expired upon the expiration of the "Sell-Off

7   Period" on June 20, 2020. Such  unauthorized uses by Defendant of the "Licensed IP"

8   constitutes common law trademark infringement.  Defendant's infringement was

9   willful.

10     26.      As a result of the foregoing willful infringement, Plaintiff is entitled to

11  injunctive relief, compensatory damages according to proof, an accounting, and the

12  disgorgement of all revenue collected by Defendant since the expiration of the "Sell-

13  Off Period."

### Fourth Claim for Unfair Competition

### (Calif. B&P Code §17200 et seq.)

16     27.      Plaintiff repeats and realleges paragraphs 1 through 17.

17     28.      Defendant has continued to exploit the "Licensed IP" without

18  authorization after its rights to do so expired upon the expiration of the "Sell-Off

19  Period" on June 20, 2020. Such  unauthorized uses by Defendant of the "Licensed IP"

20  constitutes unfair competition pursuant to California Business and Professions Code

21  §17200.

22     29.      As a result of the foregoing unfair competition, Plaintiff is entitled to

23  injunctive and restitutionary relief.

### Fifth Claim for Breach of Written Contract

25     30.      Plaintiff repeats and realleges paragraphs 1 through 17.

26     31.      Defendant has continued to exploit the "Licensed IP" without

27  authorization after its rights to do so expired upon the expiration of the "Sell-Off

28

LEVINSON ARSHONSKY & KURTZ, LLP

COMPLAINT

3163-004/1173293.docx

1  Period" on June 20, 2020. Such unauthorized uses by Defendant of the "Licensed IP"

2  constitutes a breach of the parties' agreement.

3      32.    As a result of the foregoing breach, Plaintiff is entitled to compensatory

4  damages according to proof, an accounting, and the disgorgement of all revenue

5  collected by Defendant since the expiration of the "Sell-Off Period."

6      Plaintiff prays for relief as follows:

7      1.    For compensatory damages according to proof;

8      2.    For treble damages;

9      3.    For the disgorgement of Defendant's profits from its infringing activities;

10     4.    For injunctive relief;

11     5.    For attorneys' fees; and

12     6.    For costs of suit.

13 Dated:  June 28, 2021        LEVINSON ARSHONSKY & KURTZ, LLP

14

15         By:  /s/  BARRY E. MALLEN

16         BARRY E. MALLEN
           Attorneys for Plaintiff KISS CATALOG,

17         LTD.

18         **DEMAND FOR JURY**

19

20     Plaintiff demands a trial by jury.

21

22         LEVINSON ARSHONSKY & KURTZ, LLP

23

24         By:  /s/  BARRY E. MALLEN

25         BARRY E. MALLEN
           Attorneys for Plaintiff KISS CATALOG,

26         LTD.

27

28

LEVINSON ARSHONSKY & KURTZ, LLP

COMPLAINT

3163-004/1173293.docx

# EXHIBIT "1"

License No. 10465

## LICENSE AGREEMENT

This License Agreement (this "**Agreement**"), dated as of September 16, 2016 (the "Effective Date"), is made and entered into by and between KISS Catalog, Ltd. ("**Licensor**") and JB IMPORTS, LLC a headquartered at 2404 Montclair Park Ln. Marietta, GA 30068 ("**Licensee**") with respect to the licensing of certain assets proprietary to Licensor and related to the rock and roll band KISS ("**Artist**") in connection with Licensee's manufacture and distribution of wine bearing certain indicia of Artist as set forth herein.

## RECITALS

Licensee is engaged in the business of designing, manufacturing, marketing and selling beverage alcohol products, and wishes to design, manufacture, market and sell the wine brand under the Product Name (defined below).

Licensee wishes to license from Licensor and Licensor wishes to license to Licensee the Licensed IP (defined below) in order to manufacture and sell the Licensed Product (defined below), subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

In addition to such terms as may be defined within the preamble, Recitals, or the body of this Agreement, the following terms shall have the following meanings:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Artist**" has the meaning set forth in the preamble.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, (i) controls, is controlled by, or is under common control with, such Person or (ii) owns or has the ability to vote at least fifty percent (50%) of the voting interests in such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks in Los Angeles, CA, are authorized or required by Law to be closed for business.

"**Collateral Materials**" means packaging, enclosures, promotional and marketing materials and advertising related to the Licensed Product.

"**Distribution Channels**" means wine distributors, mass market retailers, food and drug stores, and liquor stores, provided that sales to and through such channels are legal in accordance with applicable

1

License No. 10465

Law (as hereinafter defined).  For the avoidance of doubt, no direct-to-consumer sales may be made by Licensee pursuant to this Agreement.

"**Dollars or $**" means the lawful currency of the United States of America.

"**Effective Date**" means the date of this Agreement as set forth in the preamble.

"**Encumbrance**" means any charge, claim, community property interest, pledge condition, equitable interest, lien (statutory or other), option, security interest, mortgage, right of first refusal, or restriction of any kind, including any restriction on use, transfer, receipt of income or exercise of any other attribute of ownership.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: trademarks, service marks, trade names, brand names, logos, copyrights, trade dress and other proprietary source-identifying indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations of such trademarks, and renewals of such registrations.

"**KISS Logo**" means the world-famous logo in "lightning bolt" font for the rock and roll band, KISS.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, local or foreign government or political subdivision thereof, or any arbitrator, court or tribunal of competent jurisdiction.

"**Licensed IP**" means, subject to Section 2.01(d), the following Intellectual Property related to Artist, which is owned by Licensor or to which Licensor holds the necessary rights to grant the licenses set forth herein: only those Licensor-approved name(s), symbols, logos (including KISS face paint images), marks, and images of Artist as set forth on Exhibit B. For the avoidance of doubt Artist's voice, likeness without KISS makeup, sound and audio/visual recordings are excluded from the Licensed IP. It is specifically acknowledged by Licensee that all personal, publicity and other rights held by Licensor and not contained in this (including, but not limited to, the voice and sound recordings of Artist), are not licensed under this Agreement and the use thereof is strictly prohibited.

"**Licensed Product**" means wine in .75 liter and 1.5 liter bottles (additional sizes may be added upon the mutual agreement of the parties), which varietals include white table wine, red table wine, cabernet, merlot, tempranillo, malbec, rioja, sangria, and eva (white), which wine bottle and Collateral Materials incorporates any of the Licensed IP or any derivatives of the Licensed IP, which wine shall be marketed, promoted, advertised and sold solely under the Product Name. For the avoidance of doubt, the

2



License No. 10465

inclusion of each such varietal shall be subject to Licensor's prior testing and approval in accordance with Section 3.01 hereunder.

"**Licensee Indemnitees**" means Licensee, its officers, directors, employees and agents.

"**Licensing Agent**" means Epic Rights, Inc.

"**Licensor Indemnitees**" means Licensor, Gene Simmons, Paul Stanley, McGhee Entertainment, Epic Rights, Inc. and their respective Affiliates and Representatives.

"**Licensor Products**" means all products and services manufactured and distributed by or on behalf of Licensor, or manufactured and distributed by third parties pursuant to licenses granted by Licensor, save for the Licensed Product.

"**Losses**" means losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"**Net Sales**" means the gross invoiced amount billed Licensee's wholesale customers on Licensed Product, less only deductions for trade and quantity discounts actually taken (not to exceed for each invoice an aggregate of ten percent (10%) of the gross invoice amount billed the customer) ("**Permitted Discounts**"), returns for damaged goods actually credited (and supported by credit memoranda actually issued to the customers), and sales Taxes or the equivalent if applicable.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities, including all applications for any of the foregoing.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Product Name**" means an identifying Product Name to be determined by Licensor and Licensee in their mutual agreement. The Product Name is and shall remain the sole and exclusive property of Licensor and Licensee shall be solely responsible for the trademark registration of the Product Name in all applicable international trademark classes in all countries where the Licensed Product is distributed.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Royalties**" means Licensor's share of Net Sales, which share is to be paid by Licensee to Licensor as set forth in this Agreement.

"**Ship Date**" means the date that the Licensed Product shall be available for sale, such date to occur no later than 180 days after execution of the Agreement. In the even that Ship Date occurs later than 180 days after the mutual execution of this Agreement, Licensor may terminate this Agreement immediately upon written notice to Licensee without incurring liability of any kind whatsoever. In such event Licensee shall have no sell-off rights.

"**Subcontractors**" has the meaning set forth in Section 8.02.

3



License No. 10465

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever imposed by a Governmental Authority, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Term**" means the period from and after the Effective Date through and including December 31, 2019.

"**Territory**" means the United States of America.

"**Third-Party Claim**" means any Action made or brought by any Person who is not (a) a party to this Agreement (b) or an Affiliate of a party to this Agreement or (c) a Representative of the foregoing.

## ARTICLE II
## LICENSES

**Section 2.01      Grants**. Subject to the terms and conditions of this Agreement Licensor hereby grants to Licensee during the Term and in the Territory a non-transferable (except as provided in Article XIV), non-sublicenseable (except as specifically in Section 8.02) royalty-bearing right and license to use the Licensed IP, subject to Section 2.01(c), as follows:

(a)      Licensee shall have the non-exclusive right to use the Licensed IP in connection with the design of the label and packaging for the Licensed Product, and the advertising, marketing and promotion of the Licensed Product solely through the Distribution Channels (as hereinafter defined).   For the avoidance of doubt the label, packaging, Collateral Material, advertising, marketing and promotional materials for the Licensed Product are all subject to Licensor's prior approval as set forth in this Agreement.

(b)      The Licensed IP shall not be used in conjunction with any product or merchandise other than the Licensed Product. Depictions of the Licensed Product may be shown in advertising and marketing materials showing other articles sold by Licensee in a manner not likely to cause confusion in the minds of the public as to the ownership of the Licensed IP.  In no event may the Licensed Product be packaged for sale with other merchandise.

(c)      Notwithstanding the foregoing or anything else to the contrary, Licensee understands that while Licensor has registered the name KISS in several international trademark categories in various jurisdictions, Licensor has not yet secured a trademark for the use of KISS (capitalized, lower case, any combination of upper or lower case, or in any font, including the KISS lightning bolt font as used in, for example, the KISS Logo) for coverage in any category related to wine, except for trademark applications filed with the USPTO for the KISS Army logo covering wine (allowed), and the phrases "KISS SHOUT IT OUT CHARDONNAY," "HEAVEN'S FIRE," and "LICK IT UP" (all allowed, all filed in Licensor's name). Licensee understands and agrees that should it use any variation of KISS in connection with the Licensed Product, Product Name, or Collateral Materials in any way which has not been specifically approved by Licensor, it does so at it sole risk and shall bear all liability therefor. Licensee also acknowledges that Licensor has advised Licensee that there is a current trademark registration for the phrase "KISS," owned by a third party, for

4

License No. 10465

Kiss Vodka ("Third Party Vodka TM").  While such registration *may not* bar Licensee's use of the KISS Logo (which *may* be distinguishable from and not confusingly similar to the Third Party Vodka TM, particularly when combined with images of Artist in trademarked makeup), Licensor makes no representations or warranties of any kind with respect thereto and assumes no liability therefor.  Consequently, any determination to use the KISS Logo on or in connection with the Licensed Product is the sole responsibility of Licensee and its counsel, all liability for such use being assumed by Licensee.

**Section 2.02      License Restrictions and Limitations.**

        (a)      All rights not granted by Licensor to Licensee in Section 2.01 are expressly reserved by and to Licensor.  Without limiting the generality of the foregoing, Licensor shall not be prevented from itself using or granting third parties the right to use the Licensed IP in any manner whatsoever, including by way of example and without limitation in connection with Licensor's Products.

        (b)      Licensor makes no representations, warranties or guarantees with respect to the success of Licensee's sales or efforts arising from this Agreement.

        (c)      Licensee acknowledges that the licenses granted herein do not include any right, title, or interest in or to Artist or to any intellectual property rights in Artist, including, without limitation, any copyrights, patents, and/or trademarks therein or associated therewith. Furthermore, Licensee acknowledges that the license granted herein does not include the portrayals of or by Artist or any of its members in any motion picture, television production, and the like ("Media Properties").  In this connection, Licensee expressly acknowledges that its license hereunder does not include the right to use photographs, designs, materials, and artwork from Media Properties to the extent such materials are different from the Licensed IP.

**Section 2.03      Inducement.**  Licensee hereby acknowledges and agrees that Licensee's unique qualifications and financial standing are a material inducement to Licensor's entering into this Agreement.  In connection therewith, Licensee understands that Licensor is reposing Licensor's personal trust and confidence in Licensee to faithfully execute the terms of the Agreement and for Licensee to not commit any act or omission that may have the effect of causing harm to the reputation or business of Licensor, Artist or the Licensed IP, or of jeopardizing any goodwill connected to Licensor, Artist or the Licensed IP.  In the event of any breach of such trust and confidence, or any such act or omission that may, in Licensor's sole discretion, have the effect of causing such harm to the reputation or business of Licensor or Artist, or of jeopardizing any such goodwill, this Agreement will terminate immediately upon written notice from Licensor. Except with Licensor's express, written consent, the parties' conduct post-termination shall not be deemed a waiver of any early termination of this Agreement, nor may any conduct by Licensor be deemed to reinstate this Agreement post-termination.

**Section 2.04      No Encumbrances.** Licensee shall not permit the creation or imposition of any Encumbrance on the Licensed IP or record any Encumbrance against any application or registration regarding the Licensed IP in the United States Copyright Office, the United States Patent and Trademark Office or elsewhere.

5

License No. 10465

**Section 2.05     Licensing Agent.**  Licensing Agent shall administer this Agreement on behalf of Licensor and exercise such rights and powers as Licensor may exercise with respect to the enforcement and administration of this Agreement, including without limitation monitoring and overseeing Licensee's obligations under this Agreement (including, without limitation, payment and reporting obligations) and ensuring that Licensee complies with the approval and quality control provisions of this Agreement.  Unless and until notified otherwise by Licensing Agent or Licensor, Licensing Agent's contact information is as follows:

| | |
|---|---|
| Main Contact: | Lisa Streff |
| E-Mail: | lisa@epicrights. com |
| Address: | c/o Epic Rights, 8730 Sunset Blvd., Suite 400. West Hollywood CA  90069 |
| Phone: | 310.424.1908 |

**Section 2.06     Licensee's Sales Obligations.**  Licensee shall diligently and continuously advertise, promote, distribute, ship and sell Licensed Products in the Territory, and use its best efforts to make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet the demand for Licensed Product in the Territory.  During any calendar quarter of the Term, if Licensee fails to sell and ship a substantial quantity of Licensed Product anywhere in the Territory, Licensor may during the following calendar quarter upon written notice to Licensee terminate this Agreement either (i) with respect to the country(ies) in the Territory where substantial quantities were not sold or (ii) in whole.  If Licensee fails to ship Licensed Product by the Ship Date, Licensor shall have the right to terminate this Agreement immediately upon written notice to Licensee.

**Section 2.07     Inspections and Quality Control.**     Licensee shall allow Licensor or its Representatives to enter Licensee's premises and all manufacturing facilities during regular business hours, upon three (3) Business Days' notice, for the purpose of inspecting the Licensed Product and the facilities in which it is manufactured and packaged.  In the event that the quality standards herein set forth are not met, Licensee shall, upon written notice from Licensor, discontinue the manufacture and distribution of Licensed Product, unless Licensee shall have remedied such failure of quality to Licensor's satisfaction with fifteen (15) days after Licensee's receipt of notice thereof; failure to effect such remedial measures shall entitle Licensor to terminate this Agreement immediately upon written notice to Licensee and in such event Licensee shall have no sell-off rights.  Notwithstanding anything contained herein to the contrary, Licensor may terminate this Agreement immediately upon written notice to Licensee in the event of any product recall involving the Licensed Product anywhere in the Territory.

**Section 2.08     Purchases by Licensor.**  Licensor specifically shall have the right unto itself and/or its designees to purchase a reasonable quantity of Licensed Product from Licensee at Licensee's cost therefore (upon which no Royalty will be paid to Licensor), which Licensor or its designee may use solely to promote Licensor and not for resale. Licensor shall also have the right to purchase Licensed Product from Licensee at Licensee's best wholesale price (upon which no Royalty will be paid to Licensor), which Licensed Product may be resold by Licensor, subject to applicable Law.

**Section 2.09     Security.**  Licensee's inventory of Licensed Product, and Royalties and all items that bear the Licensed IP or any of Licensor's Intellectual Property are held in trust for the benefit

6



License No. 10465

of the Licensor and shall not be subject to claim by any creditor of Licensee. In the event of any default by Licensee, Licensor shall have all the rights of a secured party under the Uniform Commercial Code and the Assets shall not be listed as Licensee's assets in any bankruptcy proceeding.

**Section 2.10     No Artist Obligations.** Nothing herein shall be deemed to create any obligation on Artist, or any member thereof, to make any personal appearances of any sort or to participate or appear in any of Licensee's advertisements, marketing or promotional materials, and Artist's failure, or the failure of any member of Artist to do so shall not be deemed breach of this Agreement by Licensor.

**ARTICLE III**
**APPROVALS**

**Section 3.01**     The Licensed Product (including any containers, packaging and enclosures) and Collateral Materials must be approved by Licensor in writing in advance, such approval to be granted or denied in Licensor's unilateral discretion. Public sale and distribution will not be made until Licensor has granted its written approval of the Licensed Product. During the product development process and prior to the production of the Licensed Product or of any packaging, enclosure, promotional materials and advertising therefore, Licensee shall deliver, at Licensee's expense to Licensor the following for Licensor's approval, which approval may be granted or denied in Licensor's unilateral discretion:

(a)     A complete set of art work or sketches ("Preliminary Artwork");
(b)     Two (2) actual samples ("Prototypes") of the applicable products; and
(c)     Any and all Collateral Materials when available and prior to use.

**Section 3.02**     Licensee shall collaborate with and defer to feedback from Licensor on the labeling, packaging and pricing of the Licensed Product (the "Licensed Product Characteristics") and on any material changes to the Licensee Product Characteristics. Licensor shall have final approval over each of the Licensed Product Characteristics. For the avoidance of doubt, Licensor's approval of the Licensed Product and the Licensed Product Characteristics and Collateral Materials shall in no way affect Licensee's warranties or lessen Licensee's indemnification obligations hereunder, or be deemed to be a confirmation by Licensor of the legality of either the Licensed Product or the acts or omissions of Licensee with respect to the Licensor's manufacture, distribution, sale, marketing, advertising or promotion of the Licensed Product in any jurisdiction.

**Section 3.03**     Promptly after the first manufacture of the Licensed Product, Licensee shall deliver fourteen (14) production samples of the Licensed Product ("Production Samples), as well as all Collateral Materials. Licensee will advise Licensor in writing of the date of first public sale and distribution.

**Section 3.04**     All tangible copies of Preliminary Artwork, Prototypes, Production Samples, and Collateral Materials shall be sent to Epic Rights, 8730 Sunset Boulevard, Suite 500, West Hollywood, CA 90069 Attn: Licensing, and all electronic copies of same shall be sent to approvals@epicrights.com.



7

License No. 10465

**Section 3.05**     Failure by Licensor to approve in writing any of the samples furnished to Licensor shall be deemed a rejection thereof: there are no deemed approvals. After samples have been approved pursuant to this clause, Licensee shall not depart therefrom in any respect without the express prior written approval of Licensor. Any changes required by Licensor shall be made by Licensee.  Thereafter, Licensee shall submit additional samples of the Licensed Product and Collateral Materials to Licensor for final approval. Licensee shall submit Prototypes and Preliminary Artwork for approval no later than sixty (60) days after receipt of Licensed IP from Licensor.

## ARTICLE IV
## ADVANCE, GUARANTEE, ROYALTIES AND REPORTING.

**Section 4.01**     **Time of the Essence.** Licensee understands and agrees that time is of the essence with respect to payment of the Advance, Guarantee, and Royalties.  Without limiting any other rights or remedies of Licensor, Licensee shall pay interest on late payments, whether Advance payments or Royalty payments, at three percent (3%) plus the "prime rate" established by City National Bank, Los Angeles compounded annually at the rate from time to time in effect and calculated from the date on which such payment was due until the date paid.

**Section 4.02**     **Advance**. Upon the execution of this Agreement, Licensee shall pay to Licensor the non-refundable sum of Thirty-Five Thousand US Dollars (USD $35,000.00) as an advance against Royalties to be earned by Licensor under this Agreement (the "Advance").  The Advance is fully recoupable by Licensee from Royalties otherwise due Licensor. Following recoupment, Royalties shall be paid through to Licensor via Licensing Agent.  Notwithstanding anything to the contrary contained herein, the parties agree that in the event Licensee does not pay the Advance in full within fifteen (15) Business Days after delivery of a fully executed Agreement this Agreement shall automatically terminate. For the avoidance of doubt, delivery of monies equal to the Advance following such time period shall not serve to revive this Agreement.

**Section 4.03**     **Guarantee.**  Licensee guarantees to Licensor during the Term payment of Royalties (inclusive of the Advance) of no less than One Hundred and Fifty Thousand US Dollars ($150,000.00 USD) (the "Guarantee"), inclusive of the Advance, during the Term.   In addition to the Advance, the remaining Guarantee payments are to be paid as follows:

      1.   $50,000.00 USD on or before November 15, 2017; and
      2.   $65,000.00 USD on or before November 15, 2018.

**Section 4.04**     **Royalties.**

    (a)     Licensee shall pay Royalties to Licensor at the rate of 8% of Net Sales, subject to the terms and conditions of this Section 4.04.

    (b)     Royalties shall accrue upon the first to occur of billing, shipment or payment for Licensed Product.  Licensee may only distribute Licensed Product on a "no charge" basis for promotional, marketing, or goodwill purposes ("Promotional Articles") in limited numbers, which may not exceed in any contract year one percent (1%) of Licensed Product sold during such contract year (the "Promotional Limit"): Royalties based on

8



License No. 10465

Licensee's wholesale list price shall be paid on all Promotional Articles distributed in excess of the Promotional Limit. Licensee shall be solely responsible for all Taxes or any other charges now or hereafter imposed on the manufacture, delivery, license, sale, possession or use hereunder to or by Licensee of the Licensed Product (including, but not limited to sales, use, inventory, and value added taxes on sales of Licensed Product), and such charges may not be deducted from any monies owed Licensor under this Agreement. Royalties are to be paid without deduction (except as otherwise specifically set forth herein) or set-off of any kind.

(c)     For the avoidance of doubt, in no event may Licensee calculate Net Sales based on a price lower than the Wholesale Price(s) indicated on Exhibit C, less Permitted Discounts. Further, Net Sales shall not include sales or transfers by Licensee or its Affiliates to Licensee or its Affiliates, the sole purpose of which is to transfer the Licensed Product for eventual resale, as Royalties as result of such sales shall be based upon and paid when such Licensed Product is ultimately sold to a third party distributor, retailer, consumer or other unaffiliated party.

(d)     The Royalty rates set forth above and definition of Net Sales are and will remain throughout the Term the most favorable provided by Licensee to any licensor of music properties for the product categories covered by this Agreement. If Licensee extends to any third party better Royalty rates and/or a more favorable definition of Net Sales (or equivalent definition for purposes of calculating royalties) Licensee shall immediately advise Licensing Agent in writing and such more-favorable term(s) will apply to this Agreement from and after the date first applied under the applicable third party agreement.

(e)     Licensee hereby represents and warrants that it will in no event, including during the Term and any Sell-Off period: (i) sell the Licensed Product on an approval, consignment, or so-called "sale or return" basis; (ii) "dump" or "close-out" any Licensed Product without case-by-case written approval by Licensor, which approval may be withheld for any reason; (iii) sell or otherwise distribute Licensed Product for less than 50% of its list price; (iv) flood any market or distribution channel with off-priced goods.

**Section 4.05     Reporting, Royalty Payments and Remittances.**

(a)     Licensee shall deliver Royalty reports ("Royalty Reports") and applicable payment to Licensor on a quarterly basis within thirty (30) days after the close of each calendar quarter. Royalty Reports shall be made only on the form provided to Licensee by Licensor from time-to-time: no other format is acceptable.  Royalty Reports shall be prepared on a country-by-country and sku-by-sku basis.  Royalties shall be computed in the currency of the country where earned and paid to Licensor in U.S. Dollars at the exchange rate specified in the Wall Street Journal at the time of conversion.  Licensee shall be solely responsible for all costs of any currency conversion to U.S. Dollars, and such costs shall not reduce the amounts due to Licensor hereunder.  Acceptance of Royalties by Licensor shall not preclude Licensor from questioning the correctness of same at any time.

(b)     Licensee shall make Royalty payments no later than thirty (30) days after the end of each calendar quarter with respect to the calendar quarter just ended.  All payments should



License No. 10465

reference License No. 10316. Payments should be made with remittance information. Hard copy remittance information should be sent to Epic Rights, 8730 Sunset Boulevard, Suite 500, West Hollywood, CA 90069 Attn: Licensing Dept.; electronic remittance information should be sent to licensing@epicrights.com.

(c)     Payment of Royalties may be made by check or wire transfer as set forth below.  Wire Transfers are preferred.

Banking Information (for wires):          Address (for checks):
A/C Name:      Epic Rights, Inc.          Epic Rights, Inc.
A/C Number:   123-919440                  8730 Sunset Boulevard
S.W.I.F.T.:      CINAUS6L                  Suite 500
Routing #:      122016066                  West Hollywood, CA  90069
Bank:          City National Bank         Attn: Licensing Dept.
Bank Address:  400 N. Roxbury Drive
                Beverly Hills, CA 90210
Epic Rights Tax ID: 30-0761154

**Section 4.06     Withholding Taxes.** If withholding Taxes of any kind in any jurisdiction based on Licensor's income are required to be paid, Licensee shall notify Licensor in advance and may deduct the required amount from Royalties prior to remitting same to Licensor.  Licensee must provide Licensor with the appropriate Tax certificates within sixty (60) days after payment and provide all necessary cooperation to Licensor in order for Licensor to be reimbursed or credited. In the event Licensee does not timely provide the appropriate Tax credit form or certificates, Licensee shall reimburse Licensor for the amounts deducted from Royalties for withholding Taxes in the immediately following Royalty Report.

**Section 4.07     Audit.** Throughout the Term and for a period of four years thereafter (the "Audit Term") Licensee shall keep and maintain complete and accurate records and books of account covering all transactions relating to this Agreement (including, if applicable, documents and agreements – redacted to the extent required by confidentiality requirements – to confirm most favored nation status), including (without limitation) with respect to the manufacture, sale, and distribution of the Licensed Product and calculation of Royalties (the "Auditable Records"). Without limiting the foregoing, the Auditable Records shall include an ongoing perpetual inventory, which shall include unit quantities and cost by sku and such other detail as to enable the tracing of all Licensed Product purchased or manufactured through sale, ending inventory or other disposition of the Licensed Product. During the Audit Term, Licensor or its designee (the "Auditor") shall be entitled, on no more than one occasion per year and with no fewer than five Business Days prior written notice to Licensee, to: (i) audit and inspect ("Audit") the Auditable Records during Licensee's regular business hours; and (ii) make copies and summaries of the Auditable Records in connection with the Audit. If the Auditor discovers a deficiency in the Royalties paid to Licensor for the period audited (an "Audit Deficiency"), Licensee shall promptly pay such Audit Deficiency to Licensor. If such Audit Deficiency exceeds three percent (3%), Licensee shall also reimburse Licensor for all reasonable costs and expenses incurred by Licensor in connection with such Audit.



License No. 10465

## ARTICLE V
## INTELLECTUAL PROPERTY

**Section 5.01    Generally**.  Subject to Licensor's prior written approval and the terms of this Agreement, Licensee may affix its Intellectual Property to and use it in connection with the Licensed IP, including on Collateral Materials for the Licensed Product, which Collateral Materials have been approved by Licensor.

**Section 5.02    Proprietary Rights Notices**. Licensee shall ensure that all Licensed Product sold by Licensee and all related quotations, specifications and descriptive literature, and all other materials carrying the Licensed IP, be marked with the appropriate trademark notices in accordance with Licensor's instructions.  Licensee shall cause to be imprinted on all Licensed Product and on at least the principal face of all packaging, enclosure materials and advertising materials for the Licensed Product the following copyright notice: © 201X KISS Catalog, Ltd. Under License to Epic Rights. The year of the copyright notice shall be the year in which the latest revision of the Licensed Product, packaging, enclosure or advertising is first placed on sale.

**Section 5.03    Acknowledgement of Ownership**. The Licensed IP is and shall remain the exclusive property of Licensor and its licensors. Licensee shall not acquire any rights in the Licensed IP by virtue of this Agreement or otherwise, and Licensee's use of the Licensed IP shall inure exclusively to the benefit of Licensor.  Licensee recognizes the value of the goodwill associated with the Licensed IP, and that the Licensed IP has developed secondary meaning in the mind of the public; as such all goodwill arising from Licensee's use of the Licensed IP shall inure exclusively to Licensor.  Both during and after the Term Licensee shall neither contest, nor take any action that may adversely affect Licensor's ownership of and rights in and to the Licensed IP, or assist any third party in doing so. Licensee shall not during or after the Term register or attempt to register any trademark that is substantially similar to any trademark of Licensor or Artist. Licensee shall not merge or combine any of its trademarks with those of Licensor or Artist or include any such trademark in its corporate name or the name of any Affiliate. Licensee may not register any domain name, URL, or the like that incorporates the name of Artist, Licensor, or any of the Licensed IP.  If Licensee acquires any rights in the Licensed IP, by operation of Law, or otherwise, such rights shall be deemed irrevocably assigned to Licensor without further action by any of the parties at the end of the Term.  Licensee agrees not to dispute or challenge or assist any Person in disputing or challenging Licensor's rights in and to the Licensed IP or the validity of the Licensed IP.

**Section 5.04    Ownership of New Materials**.  Licensee acknowledges that all rights in any additional material, new versions, derivatives of, or other changes in or related to the Licensed IP created by or for Licensee ("New Materials"), shall be and will remain the exclusive property of Licensor and the same shall automatically be and remain a part of the Licensed IP.  It is the intent of this Section 5.04 that Licensee retain no ownership rights in the New Materials and, accordingly, Licensee hereby expressly agrees not to challenge the validity of Licensor's ownership of the New Materials. All New Materials constitute "works made for hire" as such term is defined in the United States Copyright Act of 1976. Licensee will ensure that all of Contractor's employees and subcontractors are subject to written agreements that either vest ownership of New Materials directly in Licensor, or vest ownership in New Materials in Licensee such that ownership is transferred to Licensor automatically under this Section.  In the event any New Materials do not constitute a work made for hire, Licensee hereby irrevocably assigns to Licensor all right, title and



11

License No. 10465

interest worldwide in and to such New Materials including all applicable intellectual property rights and other proprietary rights related to or arising therefrom. If Licensee has any rights in or to the New Materials that cannot be so assigned, Licensee unconditionally and irrevocably waives the enforcement of such rights, and all Actions of any kind against Licensor with respect to such rights, and agrees, at Licensor's request and expense, to consent to and join in any Action to enforce such rights. If Licensee has any rights to the New Materials that cannot be so waived, Licensee unconditionally and irrevocably grants to Licensor with respect to such rights, the sole and exclusive, perpetual, worldwide, fully-paid and royalty-free right and license, with rights to sublicense through multiple levels of sublicensees, to use such New Materials in any manner and for any purpose.

**Section 5.05     Registrations.**

(a)     To the extent that any jurisdiction requires the recordation of any of the licenses granted to Licensee hereunder, the parties shall cooperate to execute and submit a license consistent with this Agreement.

(b)     Licensee and its Affiliates shall refrain from taking any action or instituting any proceeding, legal or otherwise, except to enforce any provisions of this Agreement that would hinder Licensor and Licensor's Affiliates in their free and unfettered use and registration of the Licensed IP. Licensee and its Affiliates shall not challenge or contest such Intellectual Property or the registration or ownership of any Intellectual Property of Licensor (including, without limitation, the Licensed IP) connected with Licensor Products.

(c)     If Licensee's applications or registrations for the Licensed IP for the Licensed Product are cited as a bar against Licensor's applications for registering the Licensed IP for Licensor Products, Licensee shall cooperate with Licensor at Licensor's expense by providing its written consent, reasonably restricting its applications and registrations or taking other actions commercially reasonably necessary to permit Licensor's registration of the Licensed IP in connection with Licensor Products.

(d)     Licensee agrees not to use or seek to register, or authorize third parties to use or seek to register any Licensed IP, or any colorable imitation thereof or any mark confusingly similar thereto, in connection with any Licensor Products or otherwise. Licensee agrees not to seek to register, or authorized third parties to seek to register, any Licensed IP, or any colorable imitation of any Licensed IP or any mark confusingly similar to the Licensed IP.

**Section 5.06     Enforcement.**

(a)     Licensor and Licensee shall cooperate to ensure that third parties do not infringe on the Licensed IP or engage in any acts of unfair competition involving the Licensed IP. Licensee shall promptly notify Licensor of any such infringements or acts of unfair competition that come to Licensee's attention. Licensor shall have the exclusive right, exercisable at its sole discretion, to institute in its own name and/or Licensee's name, and to control all Actions against third parties relating to Licensor's copyrights, trademarks, and other proprietary rights in and to the Licensed IP, at Licensor's expense. With respect to any such Actions, Licensor shall employ counsel of its own choice to handle the litigation and any settlement thereof. Licensor shall be entitled to receive and retain all amounts awarded, if any, as damages, profits or otherwise in connection with such suits.



12

License No. 10465

(b)      Licensee shall not, without Licensor's prior written consent, institute any Action or take any action on account of such infringements, acts of unfair competition or unauthorized uses.  If, with Licensor's consent, Licensee institutes, at Licensee's sole cost and expense, such Action, Licensee shall be entitled to recover all reasonable costs and expenses incurred in such Action from any financial recovery awarded or obtained and the remainder shall be treated as Net Sales hereunder.  Licensor shall incur no liability to Licensee by reason of Licensor's failure or refusal to prosecute, or by Licensor's refusal to permit Licensee to prosecute, any alleged infringement by third parties, nor by reason of any settlement to which Licensor may agree.

(c)      Except as set forth in Sections 5.06(a) and 5.06(b), Licensee shall have the exclusive right, in its commercially reasonable discretion (and, except as provided below, at its expense), taking into account the damage to the Licensed Product, to bring, settle and compromise any and all suits or proceedings, whether by settlement or other voluntary final disposition, without the prior written approval of Licensor with respect to the Product Name and Licensed Product.  For the avoidance of doubt, nothing herein shall require that Licensor join in any such suit or proceeding brought by Licensee, and nothing herein shall diminish Licensee's indemnification obligations under this Agreement.  In the event Licensor agrees to join in any such suit or proceeding each party shall be entitled to recover all reasonable costs and expenses incurred in such suit or proceeding from any financial recovery awarded or obtained and the remainder shall be treated as Net Sales hereunder.  Licensor shall incur no liability to Licensee by reason of Licensor's failure or refusal to join in any suit or proceeding brought by Licensee.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF LICENSOR

Licensor represents and warrants to and for the benefit of Licensee that:

**Section 6.01      Organization and Qualification.**  KISS Catalog Ltd. is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of New York and has the full power and authority to license the Licensed IP to Licensee.

**Section 6.02      Authority of Licensor.** Licensor has the full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to consummate the transactions contemplated by this Agreement.  The execution and delivery by Licensor of this Agreement, the performance of its obligations under this the transactions contemplated by this Agreement have been duly authorized by all requisite action.  This Agreement has been duly executed and delivered by Licensor, and (assuming due authorization, execution and delivery by the other parties to this Agreement) this Agreement constitutes a legal, valid and binding obligation of Licensor enforceable against it in accordance with its terms.

**Section 6.03      No Conflicts; Consents.** The execution, delivery and performance by Licensor of this Agreement and the consummation of the transactions contemplated by this, do not and shall not:

(a)      conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, operating agreement or other organizational documents of Licensor;

13

License No. 10465

    (b)    conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Licensor; and

    (c)    require the consent, notice or other action by any Person under any agreement to which Licensee is a party.

**Section 6.04    Intellectual Property**.

Subject to Section 2.01(c), Licensor owns, exclusively, all right, title and interest in and to the Licensed IP, free and clear of Encumbrances, or otherwise has all rights and licenses necessary to license the Licensed IP to Licensee under this Agreement.

### ARTICLE VII
### REPRESENTATIONS AND WARRANTIES OF LICENSEE

In addition to any other representations and warranties made by Licensee in this Agreement, Licensee hereby represents and warrants to and for the benefit of Licensor and Artist as follows:

**Section 7.01    Organization of Licensee**.  Licensee is a corporation duly organized, validly existing and in good standing under the Laws of the State of Georgia.

**Section 7.02    Authority of Licensee**. Licensee has full corporate power and authority to enter into this Agreement y, to carry out its obligations under this Agreement and to consummate the transactions contemplated by this Agreement.  The execution and delivery by Licensee of this Agreement, the performance by Licensee of its obligations under this Agreement and the consummation by Licensee of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action on the part of Licensee.  This Agreement has been duly executed and delivered by Licensee and (assuming due authorization, execution and delivery by the parties to this Agreement) this Agreement constitutes a legal, valid and binding obligation of Licensee enforceable against Licensee in accordance with its terms.  This Agreement shall constitute a legal and binding obligation of Licensee enforceable against Licensee in accordance with the Agreement's terms.

**Section 7.03    No Conflicts; Consents**. The execution, delivery and performance by Licensee of this Agreement, do not and shall not:

    (a)    conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Licensee;

    (b)    conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Licensee; or

    (c)    require the consent, notice or other action by any Person under any agreement to which Licensee is a party.

    (d)    require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or

14



License No. 10465

lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Permit or Intellectual Property License to which Licensee, is a party or by which its business is bound;

(e)     require the consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority by or with respect to Licensee in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

(f)     result in the creation or imposition of any Encumbrance on the Licensed IP.

(g)     no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or regarding Licensee connected with executing and delivering and performing under this Agreement.

**Section 7.04     No Pending Actions.**  There are no Actions or Third-Party Claims pending or threatened against or by Licensee that materially and adversely affect Licensee's ability to perform under this Agreement. To Licensee's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action or Third-Party Claim.

**Section 7.05     Compliance with Laws.**  Licensee has complied, is now complying, and will hereafter comply with all Laws applicable to Licensee with respect to the conduct of its business and its duties and obligations under this Agreement.

**Section 7.06     Conduct of Licensee.**  Licensee will:
(a)     manufacture, sell and distribute the Licensed Product in an ethical manner, in accordance with all applicable Laws in the Territory, in a manner that does not reflect adversely upon the good name of Licensor or Artist (or any member thereof), and in accordance with the terms and intent of this Agreement;
(b)     will not incur any costs chargeable to Licensing Agent, Licensor or Artist;
(c)     It will not enter into any agreement relating to Artist for commercial tie-ins or promotions, or otherwise with any person or entity engaged, in whole or in part, in the production of motion pictures or television without the prior written consent of Licensor;
(d)     will manufacture, sell and distribute Licensed Product of a high standard and of such quality, style and appearance as shall be reasonably adequate and suited to their exploitation to the best advantage and to the protection and enhancement of the Licensed IP and Artist and the good will pertaining thereto;
(e)     will diligently and continuously solicit sales of the Licensed Product and actively offer the Licensed Product for sale, and make distribution in order to meet orders for the Licensed Product.

**Section 7.07     Compliance with Agreement.**  Licensee will strictly abide by the terms and conditions of this Agreement including, without limitation: (a) the terms of any license granted herein; (b) the product approval provisions of this Agreement; and (b) Licensee's payment and reporting obligations.

License No. 10465

Section 7.08      **Intellectual Property.**

(a)     The Licensed Product, designs, copyrightable materials and trademarks incorporated in or used in connection with the Licensed Product and Collateral Materials will not infringe upon the Intellectual Property, contractual rights or other proprietary rights of any third party; provided that the foregoing warranty shall be inapplicable solely to the extent that any such infringement is caused by Licensed IP consisting of makeup, designs and images.  For the avoidance of doubt, Licensee understands and agrees that the approval of any such material under this Agreement, whether by Licensing Agent, Artist or Licensor, shall in no way alter or diminish the warranty set forth in this Section 7.08.

(b)     Licensee assumes all liability for its use on or in connection with the Licensed Product and Collateral Materials or otherwise, if any, of the word KISS, including without limitation, the KISS Logo.


ARTICLE VIII<br>QUALITY CONTROL

Section 8.01      **Acknowledgement**. Licensee shall make best efforts to ensure that the quality standards prescribed herein for the Licensed Product are met with respect to all such products, whether produced or manufactured by Licensee or by its Manufacturers.

Section 8.02      **Subcontractors.**  Licensee shall have the right to subcontract the manufacture and distribution of the Licensed Product to third parties ("**Subcontractors**").  The Subcontractors shall have no rights in the Licensed IP by reason of such manufacture or distribution, and the manufacturer shall sell the Licensed Product only to Licensee or Licensee's authorize distributor(s). Licensee shall cause each such Subcontractor to sign an agreement with Licensee, which agreement shall preclude each such Subcontractor from making any claim against or bringing any Action against Licensor, Gene Simmons, Paul Stanley, and Epic Rights, Inc., and each of their respective Affiliates and Representatives for any reason whatsoever.  Licensee shall obtain the Subcontractor's written acknowledgment and agreement to all the applicable terms of this Agreement.  Licensee shall be liable for all acts and omissions of any Subcontractor and shall indemnify, defend and hold harmless Licensor, Gene Simmons, Paul Stanley, Epic Rights, Inc., and each of their respective Affiliates and Representatives against all Losses (whether direct, indirect or consequential and including without limitation any economic loss or other loss of profits, business or goodwill) incurred or suffered by such parties, or for which such parties may become liable arising out of any act or omission of any Manufacturer, whether as the result of any Third-Party Claim or any other reason or cause.

Section 8.03      **Compliance with Laws.** Licensee shall comply in all material respects with, and shall ensure that each Licensee Product is manufactured, packaged, labeled and sold in material conformity with all applicable Laws, including compliance with local and national Laws or regulations relating to the alcoholic content and distribution of the Licensed Product.  Licensor's approval of any Licensed Product or sample thereof shall not be construed to mean that Licensor has determined that the sample conforms to the Law of any applicable jurisdiction.

16



License No. 10465

**Section 8.04     Rejected, Damaged or Defective Products**. Licensee shall not sell, market, distribute or use for any purpose, or permit any third party to sell, market, distribute or use for any purpose, any Licensed Product which are damaged or defective.

**Section 8.05     Product Recall**. Licensee agrees to take all steps, which may include, without limitation, product recalls, to abate any health or safety risks posed by the Licensed Product as expeditiously as possible, as determined in its reasonable discretion. Upon Licensor's written request, Licensee shall provide to Licensor for Licensor's review and approval, a copy of Licensee's recall program for the Licensed Product. Licensee shall have complete responsibility for determining if a product recall is required and Licensee shall bear responsibility for all costs and expenses associated with any recall of the Licensed Product.

**ARTICLE IX**
**MARKETING AND ADVERTISING**

Licensee undertakes to collaborate with and defer to feedback from Licensor on the content of all marketing plans and advertising campaigns for the Licensed Product and on the general manner and style in which the Licensed IP may be used in advertising, promotional and other materials which Licensee shall use in the marketing, distribution and sale of the Licensed Product (collectively, the **"Licensed Product Campaign"**) and on material changes to the Licensed Product Campaign.  Licensee shall have final approval over each aspect of the Licensee Product Campaign, including the level of financial support and the appropriate amount of advertising, marketing, promotion and publicity.  Licensee shall bear the costs of all advertising, marketing and promotion for the Licensed Product.

**ARTICLE X**
**DEFAULT**

**Section 10.01**   In addition to any other rights and remedies, if Licensee breaches this Agreement: (i) Licensor shall have the option to terminate this Agreement immediately upon notice to Licensee in the event of a breach that in Licensor's reasonable estimation is not capable of cure; and (ii) Licensor shall have the option with respect to breaches that in Licensor's reasonable estimation are capable of cure, to terminate this Agreement upon fifteen (15) days written notice to Licensee, provided that Licensee shall have the option of preventing the termination of this Agreement by curing such default to Licensor's reasonable satisfaction during such 15-day period. Notwithstanding the foregoing, in the event of a material default (as described in subsection 10.02) by Licensee, then Licensor shall have the right to terminate this Agreement if Licensee fails to cure such default within seven (7) days after written notice of breach from Licensor or immediately upon written notice to Licensee if such material breach is not capable of cure.

**Section 10.02**   Occurrence of any of the following shall, by way of example and without limitation, constitute a material default under this Agreement:

(a)     Licensee fails to make any payment of the Advance, Guarantee or Royalties when due or fails to make timely submission of Royalty Reports when due;

(b)     The manufacture, sale or distribution of any (i) product or Licensed Product that bears or otherwise incorporates the Licensed IP or (ii) Collateral Materials not approved by Licensor in writing;

License No. 10465

(c)　　Licensee's continuing to make, sell, offer for sale, use or distribute any Licensed Product after receipt of notice from Licensor withdrawing approval of same;

(d)　　The breach of any of license granted by Licensor to Licensee pursuant to this Agreement;

(e)　　Any voluntary or involuntary recall of any of the Licensed Product because of safety, health or other hazards or risks to the public;

(f)　　Licensee institutes a voluntary case under Chapter 7, 11 or 13 of the U.S. Bankruptcy Code (the "Code") or its foreign equivalent, or consents to the institution of an involuntary case against it under the Code or its foreign equivalent; or there is an appointment of or court order entered appointing a receiver, trustee or other party with similar powers; or Licensee makes an assignment for the benefit of creditors; or Licensee experiences a material adverse change in or to its business, financial condition, or results of its operations.  As used herein, "material adverse change" means any change, effect, event, occurrence, or state of facts that is, or would reasonably be expected to be, materially adverse;

(g)　　An audit deficiency in excess of 15%, even if the deficiency is paid;

(h)　　Breach of the Code of Conduct attached hereto as Exhibit A and made a part hereof;

(i)　　Licensee fails to obtain or maintain insurance and/or provide documentation as required under under this Agreement;

(j)　　Licensee sells or authorizes sale of Licensed Product outside the Distribution Channels; or

(k)　　Licensee fails to conduct its operations or fails to perform under this Agreement in compliance with Law.

## ARTICLE XI
## POST-TERMINATION RIGHTS AND OBLIGATIONS

**Section 11.01  Effect of Termination**. On expiration or termination of this Agreement for any reason and subject to any express provisions set out elsewhere in this Agreement:

(a)　　all rights and licenses granted pursuant to this Agreement shall cease;

(b)　　Licensee shall cease all external use of the Licensed IP except as expressly permitted pursuant to Section 11.02;

(c)　　Licensee shall cooperate with Licensor in the cancellation of any licenses recorded pursuant to this Agreement and shall execute such documents and do all acts and things as may be necessary to effect such cancellation;

(d)　　Licensee shall promptly return to Licensor, or, at Licensor's option, destroy, at Licensee's expense, the Licensed IP and all copies thereof; and

(e)　　Licensee shall promptly deliver the New Materials to Licensor in a form or format reasonably acceptable to Licensor.

18

License No. 10465

**Section 11.02    Sell-Off Period.**

(a)      Provided that this Agreement is not terminated due to any default by Licensee, Licensee shall have a period of one hundred and eighty (180) days commencing upon the expiration date of this Agreement in which to sell off on a nonexclusive basis Licensed Product in Licensee's inventory or in process as of such expiration date (the "Sell-Off Period") provided, that (i) Licensee complies with all the terms and conditions of this Agreement, including, Licensee's obligation to pay Royalties and account to Licensor for such sales (such accounting to be provided to Licensor within fifteen (15) days after the expiration of the Sell-Off Period); and (ii) Licensee has not manufactured Licensed Product solely or principally for sale during the Sell-Off Period. Royalties earned during the Sell-Off Period may not be applied to any Guarantee shortfall.  Licensee shall not be authorized to dispose of the excess inventory in the Sell-Off Period to the extent that it exceeds ten percent (10%) of the total Licensed Product sold during the Term, without Licensor's prior written consent.

(b)      Both during and after the Sell-Off Period, Licensor (and or Licensor's designee) shall have the right, in Licensor's sole discretion, to purchase all or any of Licensee's then-remaining inventory of Licensed Product at Licensee's cost of manufacture. Any such purchases shall be non-Royalty bearing.  Immediately upon the commencement and expiration of the Sell-Off Period and at the request of Licensor during the Sell-Off Period, Licensee will deliver to Licensor a then current and accurate summary of Licensee's inventory of Licensed Product.  Licensed Product purchased by Licensor (or its designee) pursuant to this Section 11.02(b) may be used, sold or otherwise exploited for any purpose and in any manner whatsoever.

(c)      Following the expiration of the Sell-Off Period (or, if earlier, the termination of this Agreement for Licensee's default) all remaining Licensed Product and component parts thereof shall be destroyed within five (5) Business Days and Licensee shall deliver to Licensor a certificate of destruction evidencing same, signed by an officer of Licensee under penalty of perjury.

**Section 11.03    Survival.** Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect.

**ARTICLE XII**
**CONFIDENTIALITY**

**Section 12.01    Obligations.** Each party agrees:

(a)      not to disclose or otherwise make available to any third party any information that is treated as confidential by the disclosing party, including, without limitation, the terms of this Agreement, trade secrets, technology, information pertaining to business operations and strategies, and information pertaining to customers, clients, Artist, pricing, and marketing (collectively, the "**Confidential Information**") without the prior written consent of the disclosing party; *provided, however*, that the receiving party may disclose the Confidential Information to its

License No. 10465

officers, employees, consultants and legal advisors who have a "need to know", who have been apprised of the restrictions set forth herein and who are themselves bound by nondisclosure restrictions at least as restrictive as those set forth in this Article XII;

(b)     to use the Confidential Information as permitted under this Agreement; and

(c)     to promptly notify the disclosing party in the event it becomes aware of any loss or disclosure of any Confidential Information.

**Section 12.02    Exceptions**. Confidential Information shall not include information that:

(a)     is already known to the receiving party without restriction on use or disclosure prior to receipt of such information from the disclosing party;

(b)     is or becomes generally known by the public other than by breach of this Agreement by, or other wrongful act of, the receiving party; or

(c)     is received by the receiving party from a third party who is not under any obligation to the disclosing party to maintain the confidentiality of such information; or

**Section 12.03**    Notwithstanding the terms of Section 12.01, a party may disclose the Confidential Information of the other to the extent required by Law, including without limitation, pursuant to the terms of a court order; provided, that the receiving party has given the disclosing party prior written notice of such disclosure and an opportunity to contest such disclosure.

**ARTICLE XIII**
**INDEMNITY AND INSURANCE**

**Section 13.01    Licensor**. Licensor, indemnify and defend each of the Licensee Indemnitees against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses arising from Third-Party Claims, which Losses are incurred or sustained by, or imposed upon, Licensee Indemnitees based solely upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Licensor under this Agreement; or

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Licensor pursuant to this.

**Section 13.02    Licensee Indemnity**.  Licensee shall indemnify and defend each of the Licensor Indemnitees against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, based upon, arising out of, with respect to or by reason of Third-Party Claims, which Third-Party Claims are based upon, arise from or result from:

20

License No. 10465

(a)    the manufacture, distribution, consumption, promotion, marketing and advertising of Licensed Product or use of Collateral Materials;

(b)    any inaccuracy in or breach of any of the representations or warranties of Licensee contained in this Agreement;

(c)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Licensee pursuant to this Agreement;

(d)    Licensee's failure to comply with any Law or Regulation:

(e)    the business, operations, properties, assets or obligations of Licensor, it Affiliates and Representatives;

(f)    Licensee's obligations to any Manufacturer, supplier, importer/exporter, distributor or customer, or consumer;

(g)    Licensee's use of the Product Name;

(h)    the acts or omissions of Licensee's Manufacturers, suppliers, distributors, importers and exporters; and

(i)    products liability claims or claims of defects in the Licensed Product or the manufacture of the Licensed Product.

**Section 13.03    Indemnification Procedures**. The indemnified party shall promptly notify the indemnifying party in writing of any Third-Party Claim and cooperate with the indemnifying party at the indemnifying party's sole cost and expense. The indemnifying party shall immediately take control of the defense and investigation of such Third-Party Claim and shall employ counsel of its choice to handle and defend the same, at the indemnifying party's sole cost and expense. The indemnifying party shall not settle any Third-Party Claim in a manner that adversely affects the rights of the indemnified party without the indemnified party's prior written consent, which shall not be unreasonably withheld or delayed. The indemnified party's failure to perform any obligations under this Article XIII shall not relieve the indemnifying party of its obligations under this Article XIII except to the extent that the indemnifying party can demonstrate that it has been materially prejudiced as a result of such failure. The indemnified party may participate in and observe the proceedings at its own cost and expense with counsel of its own selection.

**Section 13.04    Insurance**.

(a)    At all times during the Term of this Agreement and for a period of five years following the expiration or earlier termination of this Agreement, Licensee shall procure and maintain from an, at its sole cost and expense commercial general liability insurance with limits no less than $2,000,000 per occurrence and $10,000,000 in the aggregate, including bodily injury and property damage and products and completed operations and advertising liability, which policy shall include contractual liability coverage insuring the representations, warranties and the activities of Licensee under this Agreement. Such policy shall provide protection against any and all Actions arising out of any defects or failures to perform, alleged or otherwise, in the Licensed Product or any material used in connection therewith or any use thereof, including without

21

License No. 10465

limitation liabilities under the provisions of any and all laws, rules and regulations applicable to the alcoholic beverage industry.

(b)     All insurance policies required pursuant to this Section shall:

(i)     be issued by an A.M. Best "A" rated (or better) qualified insurance company;

(ii)     waive any right of subrogation of the insurers and Licensee against Licensor;

(iii)     provide that such insurance be primary insurance and any similar insurance in the name of and/or for the benefit of Licensor shall be excess and non-contributory; and

(iv)     name Licensor, Paul Stanley, Gene Simmons, Artist, McGhee Entertainment, and Epic Rights, including, in each case, all successors and permitted assigns, as additional insureds.

(c)     The policy required by this Section 13.04 shall provide for thirty (30) days' notice to Licensee and Licensor from the Insurer by Registered Mail, return receipt requested, in the event of any modification, cancellation or termination. Licensee agrees to furnish Licensor a certificate of insurance evidencing such policy, policy limits and additional insureds within thirty (30) days after the date of this Agreement and, upon request of Licensor, a copy of said policy providing such coverage and in no event shall Licensee manufacture, distribute or sell the Licensed Product prior to receipt by Licensor of such evidence of insurance.

**Section 13.05    Limitations on Liability.** TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, IN NO EVENT WILL LICENSOR, ARTIST, ANY MEMBER OF ARTIST, OR LICENSING AGENT BE LIABLE TO LICENSEE FOR: (A) ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY ARISE OUT OF THIS AGREEMENT OR THE LICENSES GRANTED HEREIN, HOWEVER ARISING AND UNDER ANY THEORY OF LIABILITY AND EVEN IF SAID PARTIES KNEW, SHOULD HAVE KNOWN OR WERE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) COLLECTIVELY, AGGREGATE DAMAGES THAT EXCEED THE AMOUNT OF ADVANCES AND ROYALTIES ACTUALLY RECEIVED BY LICENSOR PURSUANT TO THIS AGREEMENT.  FOR THE AVOIDANCE OF DOUBT, THE FOREGOING LIMITATIONS ON LIABILITY FOR DAMAGES ARE INAPPLICABLE TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT.

## ARTICLE XIV
## ASSIGNMENT

**Section 14.01**    Licensee shall not have the right to directly or indirectly assign, sublicense or otherwise transfer by operation of Law or otherwise Licensee's rights and/or obligations under this Agreement without Licensor's prior written consent in each instance including, by way of example and without limitation, by contract, merger, sale of stock, sale of all or substantially all of Licensee's assets, or change in control. For purposes hereof a "change in control" shall mean the sale of 30% or more of shares of Licensee entitled to vote for Licensee's Board of Directors and/or a sale of stock or assets of Licensee to a third party that would give such Person the right to control the day-to-day policies and operations of Licensee. The aforementioned restriction on

22

License No. 10465

assignment is intended to supplement and not replace any provision of federal or state Law that excuses Licensor from accepting performance from or rendering performance to an entity other than Licensee, and nothing contained in this Agreement is intended to waive or limit such provisions of Law.  Further, Licensor expressly reserves the right under Section 365(c)(1)(B) of the U.S. Bankruptcy Code to withhold consent or object to any assumption or assignment of this Agreement by Licensee in any future bankruptcy proceeding.

**Section 14.02**   Licensor reserves the right to assign this Agreement to any third party and to hypothecate or pledge this Agreement as collateral for any purpose.  In the event of any such assignment, Licensee shall pay the Royalties, Advances, and Guarantee due hereunder as directed by Licensor. This Agreement shall be binding upon and shall inure to the benefit of Licensor's successors and assigns and Licensee's permitted assignees.

### ARTICLE XV

### MISCELLANEOUS

**Section 15.01   Further Assurances.** Each party shall, upon the reasonable request, and at the sole cost and expense, of the other party, promptly execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

**Section 15.02   Relationship of the Parties.** The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and no party shall have authority to contract for or bind another party in any manner whatsoever.

**Section 15.03   Public Announcements.** Licensee shall not issue or release any announcement, statement, press release or other publicity or marketing materials relating to this Agreement, or, unless expressly permitted under this Agreement, otherwise use the Licensor's trademarks, service marks, trade names, logos, symbols or brand names, in each case, without the prior written consent of Licensor, which shall not be unreasonably withheld or delayed.

**Section 15.04   Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section).

If to Licensor:          c/o Joseph Young Associates, Ltd.
                         18 Hook Mountain Road, Suite 203
                         P.O. Box 807
                         Pine Brook, NJ  07058-9785



23

License No. 10465

with a copy to:

William Randolph
Gordon, Herlands & Randolph
355 Lexington Avenue, 10th Floor
New York, NY 10017

If to Licensee:        Juan Bonilla Imports LLC

2404 Montclair Park Ln

Marietta, GA 30068

Facsimile:    770 971 9372
Attention:    Juan Bonilla, President

**Section 15.05    Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Sections, Schedules and Exhibits refer to the Sections of, and Schedules and Exhibits attached to, this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 15.06    Entire Agreement.** This Agreement, together with all Schedules and Exhibits and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 15.07    No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

**Section 15.08    Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

24

License No. 10465

**Section 15.09    Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 15.10    Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 15.11    Governing Law; Submission to Jurisdiction**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of California. Any legal suit, action or proceeding arising out of or related to this Agreement or the Services provided hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of California in each case located in the city of Los Angeles and County of Los Angeles, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding and irrevocably waives the right to object to the venue and location of such courts whether based on the theory of *forum non conveniens* or any other similar theory or Law. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court.

**Section 15.12    Waiver of Jury Trial**. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 15.13    Equitable Relief**. Licensee acknowledges that a breach by Licensee of this Agreement may cause Licensor irreparable damages, for which an award of damages would not be adequate compensation and agrees that, in the event of such breach or threatened breach, Licensor shall be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance and any other relief that may be available from any court, in addition to any other remedy to which Licensor may be entitled at law or in equity. Such remedies shall not be deemed to be exclusive but shall be in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary.

**Section 15.14    Remedies Cumulative**.  All rights and remedies of Licensor provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available

25

License No. 10465

to Licensor, whether provided by law, equity, statute, in any other agreement between the parties or otherwise.

**Section 15.15    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 15.16    Code of Conduct.**  Licensee agrees that it will strictly abide by, and cause or ensure that its suppliers, Manufacturers, permitted sublicensees and contractors strictly abide by the Code of Conduct attached hereto as Exhibit A.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

KISS CATALOG, LTD.

By: 

Name: Gene Simmons

Title: President

Date: 12/9/16

JUAN BONILLA IMPORTS LLC

By: 

Name: Juan Bonilla

Title: President

Date: 12/1/2016

26

License No. 10465

## EXHIBIT A
## CODE OF CONDUCT

Licensor and Artist ("We," "Us") are committed to ethical business practices. We engage in business solely with third parties ("Business Partners") that comply with the following minimum expectations.  This Agreement may be terminated early for failure to comply with the letter or spirit of this Code of Conduct.

**Forced Labor**: Business Partners may not use forced, prison, indentured, or bonded labor or permit their suppliers or subcontractors to do so.

**Child Labor**: Business Partners may not hire persons younger than 16 or the age of completing compulsory education in the country where located.

**Harassment or Abuse**: No employee shall be subject to physical, sexual or psychological harassment or abuse or any sort of corporal punishment.

**Nondiscrimination**: Business Partners shall not subject any person to discrimination on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, or social or ethnic origin.

**Health and Safety**: Business Partners shall provide a safe and healthy working environment. Employers must fully comply with all applicable workplace conditions, safety and environmental laws.

**Freedom of Association**: Employees shall have the right to freely associate.

**Wages and Benefits**: Employees shall be paid at least the minimum wage required by local law. Employees shall be compensated for overtime hours as is legally required, or where such laws do not exist, at a rate at least equal to their regular hourly compensation rate, and shall be provided legally mandated benefits.

**Work Hours and Overtime**:  Employees shall not work more than the limits allowed by the law of the country where located, and in any event no more than 48 hours per week of regular work hours and 12 hours of overtime.  Employees must have at least one day off per week. Workers must be informed at the time of their hiring if mandatory overtime is a condition of their employment.

**Legal and Ethical Business Practices**: Business Partners must fully comply with all applicable local, state, federal, national and international laws, rules and regulations.  Business Partners must be ethical in their business practices.

**Monitoring**: We reserve the right to require Business Partners to provide written confirmation that they have a monitoring program in place for their suppliers and subcontractors. We reserve the right to inspect Business Partner's facilities during normal working hours at any time.  No portion of Business Partner's facilities will be "off limits" to us or our designees.

27

License No. 10465

**EXHIBIT B**
**LICENSED IP**

1. The phrase "KISS SHOUT IT OUT CHARDONNAY" as filed with the USPTO (Serial No. 86179583);

2. The KISS ARMY logo (form and content) as filed with and allowed by the USPTO (Serial No. 86846561);

3. The phrase "HEAVEN'S FIRE" as filed with and allowed by the USPTO (Serial No. 86776296);

4. The phrase "LICK IT UP" as filed with and allowed by the USPTO (Serial No. 86758686); and

5. Such other images, including the KISS Logo and facepaint/makeup designs of KISS band members, as provided by Licensor from time to time in its sole discretion.

License No. 10465

**EXHIBIT C**
**MINIMUM WHOLESALE PRICING**

| | | |
|---|---|---|
| White 750 mL | | $4.65 |
| White 1.5L | | $5.46 |
| Red 750 mL | | $4.77 |
| Red 1.5L | | $5.82 |
| Cabernet 750 mL | | $6.35 |
| Merlot 750 mL | | $6.46 |
| Tempranillo 750 mL | | $7.63 |
| White (eva) 750 mL | | $6.45 |

29

# EXHIBIT "2"



February 18, 2021

VIA EMAIL
JB Imports
2404 Montclair Park Ln
Marietta, GA 30068
ATTN: Juan Bonilla

Re:     Kiss Catalog, Ltd. / Infringing KISS Merchandise

Dear Mr. Bonilla:

As you are keenly aware, Epic Rights, LLC ("Epic") is the exclusive licensing and merchandising agent for Kiss Catalog, Ltd., the merchandising corporation of the world-renowned rock and roll band KISS (hereinafter referred to as our "Client"). I write with respect to that certain license agreement between our Client and JB Imports dated September 16, 2016 ("License Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the License Agreement.

The License Agreement expired on December 31, 2019 and its Sell-Off Period expired on June 30, 2020. Despite the expiration of the License Agreement and multiple notifications from Epic that the License Agreement would not be renewed or extended, JB Imports continues to manufacture, promote, and sell products bearing our Client's trademarks and copyrighted materials ("Infringing Products").

In the absence of a valid license, your actions constitute a direct and blatant infringement of our Client's intellectual property rights, as well as the contractual rights of Epic and those of legitimate licensees. Your exploitation of our Client's popularity, reputation, and unmistakably well-known intellectual property in order to promote, advertise and market KISS-branded merchandise outside of a valid license agreement falsely implies that our Client has granted you the right to do so, which as you know, is no longer the case. These flagrant infringements of our Client's rights may constitute a number of other violations, including: trademark infringement, copyright infringement, unfair competition, dilution, false designation of origin, passing off, misappropriation of likeness for commercial purposes, misrepresentation, violation of rights of publicity, and interference with our Client's contractual obligations to third parties (collectively, the "Infringing Activities").

Be advised that the Infringing Activities may subject JB Imports to statutory damages, as well as other damages including recovery of profits, treble damages, and costs incurred in the defense our Client's intellectual property rights.

On behalf of our Client, we hereby demand that you act expeditiously to comply with the following:

1.  Immediately cease and desist from any all marketing, advertising, promotion, manufacture, distribution, sale, and other exploitation of all Infringing Products.

EpicRights.com

1

2. Immediately remove all Infringing Products from all brick-and-mortar retail stores and ecommerce sites where they are currently available.

3. Immediately cease any and all reproduction, adaptation, distribution, or other exploitation of our Client's name, likeness, trademarks and copyrighted materials, and remove any and all other depictions of and references to our Client (as well as any links thereto) on your website and/or any other distribution channels, including *but not limited to*: https://kissonline.passionspirits.com/kissonline.html.

4. Immediately cease the use of our Client's name as a search term for, or in the URL of, any Infringing Product.

5. Provide a complete, detailed accounting to us with respect to all sales and revenues, including JB Imports' profits, generated by JB Import's sale of Infringing Products, including accompanying payment, to be received by Epic no later than close of business on Friday, February 26, 2021.

6. Provide a complete, detailed report to us indicating the total number and type of Infringing Products currently on-hand, and the location(s) thereof, to be received by Epic no later than close of business Friday, February 26, 2021.

The foregoing is not intended to be an exhaustive listing of all of your misconduct vis-à-vis our Client and Epic. The foregoing is without prejudice to any rights, remedies, or claims otherwise available to our Client or Epic under the law or in equity, all of which are hereby expressly reserved.

Please contact me to confirm your receipt of this notice and your compliance with the foregoing demands.

Very truly yours,

Ashley Fogerty, Esq.
VP, Business & Legal Affairs
Epic Rights, LLC